# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2017-0451, <u>Lloyd T. Graves, Trustee of the Lloyd T. Graves Revocable Trust – 1997, Hampton and North Hampton, New Hampshire v. Town of Hampton</u>, the court on June 21, 2018, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The plaintiff, Lloyd T. Graves, as Trustee of the Lloyd T. Graves Revocable Trust – 1997, Hampton and North Hampton, New Hampshire (Graves), appeals an order of the Superior Court (<u>Anderson</u>, J.) denying his petition to lay out a class V highway on "Lot B" in the Stowecroft Subdivision in Hampton. We affirm.

I. Facts

The relevant facts follow. Graves owns two parcels of land relevant to this dispute. The first parcel consists of 12.65 acres of undeveloped land (Parcel 1). Most of Parcel 1 is located in Hampton. The second parcel, the parcel on which Graves lives, consists of approximately three acres of land and is located in North Hampton (Parcel 2). Graves's two parcels share a common boundary, which roughly tracks the town line between Hampton and North Hampton, and is approximately 100 feet in length. Existing access to Parcel 1 is via that common boundary. According to the trial court, "there is a gravel path – approximately the width of a driveway – that extends from the edge of [Parcel 2]'s paved driveway in a southerly direction, all the way down to [Parcel 1]." At the point at which the path stops in Parcel 1, it is approximately 27 feet wide.

Parcel 1 abuts "Lot B," an undeveloped .03-acre tract of land that is part of the Stowecroft Subdivision. Lot B contains several trees and rocks and a stone wall that separates it from Parcel 1.

On January 5, 1983, the Stowecroft Subdivision Plan was conditionally approved by the planning board for the defendant, the Town of Hampton (Town). Some of the conditions required by the planning board were the result of an agreement made between a subcommittee of the planning board and the developer. One such condition was that the developer would

> create Lots A, B, and C – Lot A to be a 50' strip giving access to the Ross property, Lot B to be a 50' strip giving access to the Graves property and Lot C being a 50' strip giving access to the Stevens

property – these lots will be specified as non-building lots and will remain in [the developer] for a period of six (6) years after recording of plans, after which ownership of the lots goes to the Town - during the six year period, [the developer] retains the right to sell lots A, B, and C to provide access to abutting properties.

This condition is memorialized on the Stowecroft Subdivision Plan as "Note 3," which states:

LOTS A, B, & C ARE 50' STRIPS TO BE USED FOR FUTURE ACCESS TO ABUTTING PROPERTIES. THESE LOTS ARE NON-BUILDABLE LOTS. OWNERSHIP REMAINS IN [THE DEVELOPER] FOR A PERIOD OF SIX (6) YEARS FROM RECORDING DATE OF THESE PLANS, AFTER WHICH OWNERSHIP GOES TO THE TOWN OF HAMPTON. [THE DEVELOPER] RETAINS THE RIGHT TO SELL LOTS A B & C DURING THE SIX YEAR PERIOD TO PROVIDE ACCESS TO ABUTTING PROPERTIES.

Lot A eventually became part of Westridge Drive, which connects Stowecroft Drive to the Westridge Subdivision and connects the Westridge Subdivision to Exeter Road. The Westridge Subdivision was constructed in the mid-to-late 1990s by the same developer that constructed the Stowecroft Subdivision. Lot C eventually became part of Fieldstone Circle, a circular road that serves the Fieldstone Subdivision.

Lot B is situated where Stowecroft Drive ends in a cul-de-sac. Stowecroft Drive traverses the middle of the Stowecroft Subdivision and is more than 2,000 feet long. The Town has not formally accepted Stowecroft Drive as a public road, although it has maintained it.

In October 2013, Graves agreed to sell Parcel 1 to Green & Company Building and Development Corporation (Green & Company) for $640,000. The agreement is conditioned upon the parties obtaining the requisite approvals for a residential subdivision consisting of at least 10 lots. Green & Company hired an engineering firm to design a 13-lot subdivision called "Dalton Woods." The plans for the Dalton Woods Subdivision propose that a road be built over Lot B to provide access to the subdivision. The proposed road would extend from the Stowecroft Drive cul-de-sac over Lot B and then branch off into two proposed subdivision roads that would each end in a cul-de-sac.

In May and June 2014, the planning board considered Green & Company's application to construct the Dalton Woods Subdivision. At its May 2014 meeting, the planning board expressed concern about the title of Lot B. At its meeting in June 2014, at the request of Green & Company's engineering firm, the planning board voted "to allow conversion of the [subdivision] application to design review."

In December 2014, Graves petitioned the selectboard to lay out "Stowecroft Drive Extension," a class V highway, over Lot B. The selectboard denied the petition in a 3-2 vote.

Graves appealed the selectboard's decision to the superior court, which reviewed his petition de novo. Following a three-day bench trial and a view of the property, the trial court denied the petition, concluding that there was no occasion for laying out the proposed extension. Although it found no public interest in laying out the proposed extension, the trial court assumed arguendo that a slight interest exists and determined that the burden imposed on the Town by the layout outweighed it. The trial court ruled that the Town had a statutory obligation to plow, pave, and rebuild the proposed extension. See RSA 231:3, I (2009). The trial court observed that, according to the Town's witnesses, plowing a cul-de-sac is difficult and those "difficulties would increase if the Town had to plow a small stub of a road off of the existing Stowecroft Drive cul-de-sac." The court further stated that it found credible testimony regarding "the increased maintenance costs of a road constructed upon wet soils." Based upon that testimony and upon one of the Town's exhibits, the court found that, because of Lot B's "hydrological characteristics," a road built over Lot B would require "more frequent annual maintenance" and "would have to be rebuilt twice as frequently as a typical road." Accordingly, after equitably weighing the "slight public interest in the layout" against the burdens imposed upon the Town, the court found "no occasion for the layout." Graves unsuccessfully moved for reconsideration of the superior court's decision, and this appeal followed.

II. Analysis

RSA 231:8 (2009) grants to a municipal selectboard the authority, upon petition, to "lay out any new class IV highway not financed in whole or in part with federal aid highway funds, and class V or VI highway or alter any such existing highway within [the] town for which there shall be occasion." If a town refuses to lay out a road, the plaintiff may petition the superior court to do so. Wolfeboro Neck Prop. Owners Assoc. v. Town of Wolfeboro, 146 N.H. 449, 452 (2001); see RSA 231:38 (2009). "The superior court conducts a de novo hearing to make an independent determination of the occasion, or appropriateness, of laying out a road as requested." Wolfeboro Neck Prop. Owners Assoc., 146 N.H. at 452 (quotation omitted).

Assessing whether there is an "occasion" to lay out a road involves a two-step process in which competing interests are equitably balanced. See Green Crow Corp. v. Town of New Ipswich, 157 N.H. 344, 350 (2008). The first step requires balancing the public interest in the layout against the rights of the "affected landowner." Id. (quotation omitted). If the affected landowner's rights outweigh the public interest, then there is no occasion to lay out the road. See id. By contrast, if the public interest justifies taking the land without the

landowner's consent, meaning laying out the road on the landowner's land, then the analysis proceeds to the second step, which entails balancing the public interest in the layout against the burden imposed upon the town.  See id.  If the balancing required by the second step favors the public interest, then there is an "occasion" for laying out the road.  See id.

In the instant case, the identity of the "affected landowner" is disputed.  As a result, the superior court focused upon the second step of the "occasion" determination — balancing the public interest in the layout against the burden imposed upon the Town.

To assess the public interest, the selectboard and the trial court may consider, among other factors: (1) the road's integration within an existing road system; (2) whether the road will ease existing traffic flow; (3) whether the road will improve travel convenience; (4) whether the road will facilitate transporting existing school children; (5) whether the road will make business district and employment centers more accessible; (6) whether the road will make fire, emergency, and police services more accessible; (7) whether the road will benefit a significant portion or a small fraction of the town tax base or year-round residents; and (8) the anticipated frequency of the road's use.  See Crowley v. Town of Loudon, 162 N.H. 768, 773-74 (2011).  Relevant to the assessment of the road's burden on the town are the anticipated costs of constructing and maintaining the road as well as the road's impact on the town's infrastructure due to municipal growth, such as increased costs for school, fire, police, and emergency systems.  Id. at 774.

We will uphold the superior court's decision as to whether an occasion exists if it is supported by some evidence and is not based on fraud, gross mistake, or errors of law.  Wolfeboro Neck Prop. Owners Assoc., 146 N.H. at 452.  "We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence."  O'Malley v. Little, 170 N.H. 272, 275 (2017) (quotation omitted).  "Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence."  Id. (quotation omitted).  The factual findings of the trial court are particularly "within its sound discretion . . . when a view has been taken."  Sleeper v. Hoban Family P'ship, 157 N.H. 530, 537 (2008) (quotation omitted).  Conversely, we review the trial court's legal conclusions and its application of the law to the facts de novo.  See O'Malley, 170 N.H. at 275.

Graves first argues that the trial court "failed to give appropriate weight to the existence of, and the circumstances surrounding the creation of, Note 3 on the Stowecroft Plan, creating Lot B and preserving it for future subdivision access as demonstrative of the public interest."  Before the trial court, Graves made two arguments relative to Note 3 on the Stowecroft Subdivision Plan.

4

The first argument was that, because Lot B "has been dedicated to public use" by virtue of Note 3, "the right-of-way over Lot B is a dedicated way," and, therefore, "there is a public interest in fulfilling that dedication by laying out the . . . [e]xtension over Lot B." The second was that "the intent of the 1983 Planning Board, as evidenced by Note 3 and by the board's meeting minutes, was to provide access to future development of [Parcel 1], and that this intent supports finding a public interest in laying out a public road over Lot B."

The trial court declined to address the merits of the first argument (that the right-of-way over Lot B is a dedicated way), ruling that "the proper vehicle for resolving such a [claim] is a declaratory judgment action or an action to quiet title," and observing that Graves had not filed either such action, but instead, had "only brought a petition for a layout pursuant to RSA 231:38." On appeal, Graves neither presses the first argument nor contests the trial court's declination to rule upon its merits.

With respect to Graves's second argument, the trial court agreed with him that the planning board's approval of the Stowecroft Subdivision "was conditioned on the creation of Lot B (as well as Lots A and C)." The trial court also agreed with Graves that the planning board at least "contemplated that Lot B might be used to provide future access to [Parcel 1]." Additionally, the trial court agreed with Graves "that the Planning Board contemplated future development of [Parcel 1] – and of the other two undeveloped parcels abutting the Stowecroft land – during the approval process for the Stowecroft subdivision." Specifically, as Graves had argued, the trial court found that the public policy goals of the planning board were for the "orderly development and orderly expansion of utilities." (Quotation omitted.) In addition, the trial court determined that the planning board "required the creation of Lot B, as a condition of approving the Stowecroft subdivision, in order to allow for the possible continuation of Stowecroft Drive sometime in the future."

Nonetheless, the trial court ruled that the planning board's intent with respect to Lot B was not "relevant . . . to whether there is a public interest in laying out a class V highway over Lot B" because whether Stowecroft Drive would ever be continued "was not for the 1983 Planning Board to decide." The court determined that, even if the planning board had "intended for an access road to be laid out across Lot B, this was at most an aspirational goal," because "roads must be approved by the town, not the planning board." (Quotations and brackets omitted.) The court observed that its "inquiry in the instant action is limited to whether there is an occasion to lay out a road over Lot B" and that it was not "being asked to decide – and [was] not deciding – whether Graves . . . has an easement, right-of-way, or other interest in or over Lot B." The court reasoned that "[v]iewed through this lens," it did not agree with Graves "that the 1983 Planning Board's intent is relevant to the occasion analysis."

5

On appeal, Graves argues that the trial court erred by failing "to give appropriate weight to the existence of, and the circumstances surrounding[,] the creation of Note 3 on the Stowecroft Plan," which he asserts "demonstrate[s] that the . . . Planning Board intended that such access for future development should be available in perpetuity to [him] . . . in order to benefit the public[]." However, "it was the province of the trial court to determine the weight to give this evidence." Town of Newbury v. Landrigan, 165 N.H. 236, 240-41 (2013). Based upon our review of the record submitted on appeal, we cannot conclude that the trial court's treatment of the planning board's intent constituted fraud or gross mistake or legal error. See Wolfeboro Neck Prop. Owners Assoc., 146 N.H. at 452. Contrary to Graves's assertions, we conclude that "a reasonable person could have reached the same decision as the trial court based upon the same evidence." O'Malley, 170 N.H. at 275 (quotation omitted).

Graves next asserts that the trial court erred by failing "to afford any weight at all to the public interests [he] identified," relying instead "exclusively" upon "the considerations identified as relevant by the New Hampshire Supreme Court." (Quotation omitted.) See Crowley, 162 N.H. at 773-74 (identifying considerations relevant to determining whether there is public interest in laying out a public road). Graves is mistaken. In analyzing the public interest in laying out the road extension at issue, the trial court examined both the factors we have previously identified as relevant to that inquiry as well as the additional factors urged by Graves.

Graves next contends that the trial court erred by refusing "to consider future development in its evaluation of the public interest in laying out a highway, considering only existing conditions." In so doing, Graves argues, "the trial court . . . cut itself off from the factual realities of this unique, fact-specific inquiry."

The trial court declined to consider the potential future development of the Dalton Woods Subdivision in assessing the public interest in laying out the proposed extension based, primarily, upon our decision in Green Crow. In Green Crow, an interlocutory appeal, we were asked whether a selectboard could "consider as part of the occasion analysis the anticipated impact associated with the development that [might] result" from the proposed upgrade and reclassification of an existing "Class VI road to Class V status." Green Crow, 157 N.H. at 345 (quotations omitted). The parties disagreed about whether, when a subdivision or development has been only conditionally approved and has not yet been constructed, it is proper, for the selectboard in the first instance or the trial court in its de novo review, to consider "the impacts associated with potential future development." Id. at 351. The plaintiff argued that doing so is improper because it invades the province of the planning board to consider land use and municipal growth issues. Id. The town countered that the impacts associated with potential future development,

6

such as the increased burden on the town's schools, fire, emergency, and police systems, and environmental impacts, are pertinent to assessing the burden from a road layout upon a town. Id.

We agreed with the plaintiff, deciding that, based upon the planning and zoning scheme created by the legislature, "it is clear that the legislature intended for municipal land use planning and zoning to occur within the confines" of those "comprehensive" statutes, "with significant authority resting with the planning board," and "that the legislature did not intend for a [selectboard] to use its authority to determine occasion for the layout or upgrade of a highway . . . as a vehicle for effectively conducting land use planning or zoning." Id. at 355.

The trial court in this case concluded that Green Crow "strongly suggests that where, as here, the layout petition relates to a proposed development, the superior court should not consider, as part of the occasion analysis, whether the ability to develop the parcel for a particular purpose is dependent upon the proposed layout." The court reasoned that, because we held in Green Crow that it is improper for the selectboard and trial court to "consider as part of the occasion analysis the anticipated impact associated with the development that may result" from the layout of a road, it is "equally inappropriate to consider the anticipated impact of potential development on the public interest side of the equation." (Quotation omitted.) The court decided that this was particularly so when, as in this case, "the potential development served by the layout is an unapproved idea." (Quotation omitted.) The court determined that "[w]ithout an approved subdivision plan," the court could only speculate as to "what the Planning Board will approve." (Quotation omitted.) Graves does not articulate, and we are unable to discern, why the trial court's reasoning is legally erroneous.

Graves next argues that the facts he presented "demonstrate unequivocally that the occasion for a layout exists." He asserts that "[n]o reasonable person, after considering the evidence presented, in weighing the equitable balancing of the competing interests," could have found otherwise. (Bolding omitted.) The evidence before the trial court was conflicting, however. Resolving conflicting evidence was for the trial court in the first instance, and we defer to its judgment in so doing. See O'Malley, 170 N.H. at 275.

Graves next contends that, in assessing the burden of the proposed extension upon the Town, the trial court improperly relied "on land use planning and zoning functions" when it referred to Lot B's "hydrological characteristics." He argues that this reference was improper because "[t]he hydrological conditions of the proposed subdivision are land use impact issues to be considered by the Planning Board." However, the trial court did not consider the "hydrological conditions of the proposed subdivision." It considered only that the proposed extension would be built on wet soil.

7

Graves next argues that the denial of his petition to lay out the extension deprived him of the economically viable use of his land and, thus, effectuated a taking. Graves reasons that a taking has occurred because "Lot B is the only legal, viable option for right-of-way access into [Parcel 1]," and because the denial of the layout "has the direct effect of preventing Green & Company, and Graves, from pursuing the Dalton Woods subdivision application before the . . . Planning Board." This argument rests upon a factual finding that the trial court declined to make and that we are unable to make in the first instance. The trial court expressly declined to decide whether laying out the proposed extension over Lot B was the "only feasible access point" for the proposed Dalton Woods Subdivision.

Graves next contends that, because the Town argued that one of its burdens from the layout petition was the loss of open space, the denial of the petition requires him to bear entirely the burden of preserving Parcel 1 as open space. See Burrows v. City of Keene, 121 N.H. 590, 600 (1981). However, the trial court expressly rejected "the Town's argument that it would be appropriate to effectuate an interest in maintaining [Parcel 1] as open space through the denial of a layout petition." The trial court observed that "[t]he appropriate use(s) to make of [Parcel 1] are not for [the trial court] to decide," and that the Town's argument "potentially create[s] an issue under the Takings Clause."

Ultimately, any takings claim that Graves may have is not properly before us at this time. Before us is Graves's appeal of the superior court's decision in his appeal from the selectboard's denial of his layout petition. Graves did not bring an inverse condemnation claim for damages in superior court. Indeed, at trial, his attorney specifically stated that Graves was not seeking damages for inverse condemnation in this case. Nor did Graves bring an equitable petition for declaratory relief.

In sum, because we cannot say that the superior court's decision is unsupported by the evidence or based upon fraud, gross mistake, or legal error, we uphold its determination that there is no occasion to lay out the proposed extension. See Wolfeboro Neck Prop. Owners Assoc., 146 N.H. at 452.

Affirmed.

LYNN, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

**Eileen Fox,
Clerk**